IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CINDY ROSE CARMONA O/B/O F.I.C,  )
A MINOR,                         )
                                 )
            Plaintiff,           )
                                 )
      v.                         )      Civil Action No. 22-275-GBW-CJB
                                 )
KILOLO KIJAKAZI,                 )
Acting Commissioner of Social Security,  )
                                 )
            Defendant.           )
                                 )

## REPORT & RECOMMENDATION

Plaintiff Cindy Rose Carmona ("Carmona"), on behalf of F.I.C, a minor ("Plaintiff"), appeals from a decision of Defendant Kilolo Kijakazi, the Acting Commissioner of Social Security ("the Commissioner" or "Defendant"), denying Plaintiff's application for supplemental security income ("SSI") under Title XVI of the Social Security Act ("SSA"). *See* 42 U.S.C. §§ 1381-1383f.  The Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).

Presently pending before the Court are cross-motions for summary judgment filed by Plaintiff and the Commissioner (the "motions"). (D.I. 14; D.I. 18)  Plaintiff asks the Court to reverse the Commissioner's decision with an instruction that benefits be awarded or that the case be remanded for further proceedings. (D.I. 15 at 14)  The Commissioner opposes that request and asks that the Court affirm her decision. (D.I. 19 at 29)  For the reasons set forth below, the Court recommends that the District Court DENY Plaintiff's motion for summary judgment and GRANT Defendant's motion for summary judgment.

## I.   BACKGROUND

### A.   Procedural Background

On May 26, 2017, Carmona filed for SSI on behalf of Plaintiff, her daughter; Plaintiff alleged disability beginning on May 10, 2017 when Plaintiff was nine years old.  (D.I. 9 (hereinafter "Tr.") at 242)[1]  Plaintiff's claim was denied initially and then again upon reconsideration.  (*Id.* at 89, 98)  Plaintiff filed a request for a hearing.  (*Id.* at 163-64)  Carmona appeared before an Administrative Law Judge ("ALJ") on July 16, 2019, but the hearing was adjourned so that Plaintiff could obtain counsel.  (*Id.* at 59-88, 192)  Carmona then testified at a hearing before the same ALJ on June 2, 2020, with counsel present.  (*Id.* at 32-58)

On September 23, 2020, the ALJ issued a decision denying Plaintiff's request for SSI benefits.  (*Id.* at 13-24)  Plaintiff requested review of the ALJ's decision by the Appeals Council, and the Appeals Council ultimately denied Plaintiff's appeal.  (*Id.* at 1-4)  Thus, the ALJ's decision became the final decision of the Commissioner.  *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000).

On March 1, 2022, Carmona filed a Complaint in this Court seeking judicial review of the ALJ's decision.  (D.I. 1)  On August 8, 2022, Plaintiff filed her motion for summary judgment.  (D.I. 14)  The Commissioner opposed Plaintiff's motion and filed her cross-motion for summary judgment on September 7, 2022, (D.I. 18); briefing on the motions was completed on September 21, 2022, (D.I. 22).  On September 16, 2022, United States District Judge Gregory B. Williams referred this case to the Court to hear and resolve all pretrial matters, including the resolution of case dispositive motions.  (D.I. 20)

**B.    Factual Background**

---

[1]    Although Carmona filed for disability on behalf of Plaintiff and filed this suit on Plaintiff's behalf, for ease of reference, going forward the Court will simply refer to Plaintiff as the relevant actor (i.e., "Plaintiff argued" or "Plaintiff filed").

### 1.    Plaintiff's Relevant Medical History

Plaintiff alleges that she suffers from a number of physical and mental health conditions. Of those, the conditions relevant to the instant appeal are attention deficit hyperactivity disorder ("ADHD"), oppositional defiant disorder ("ODD") and anxiety disorder.  (Tr. at 90, 267) Below, the Court sets out some evidence of record regarding these conditions.[2]

Plaintiff's records indicate that she has a lengthy history of ADHD, ODD and anxiety. Around the time when Plaintiff applied for disability, Carmona brought Plaintiff to Dr. Anand Gundakaram, M.D. ("Dr. Gundakaram") for a follow-up evaluation regarding Plaintiff's conditions and behaviors.  (*Id.* at 650)  During the evaluation, Carmona noted that Plaintiff had defiant behavior both at home and at school; this involved, for example, Plaintiff leaving the classroom, refusing to do work, and exhibiting extreme fluctuations in her mood, which resulted in emotional and physical outbursts.  (*Id.*)  Dr. Gundakaram recommended that Plaintiff attend counseling, but he made no adjustments to Plaintiff's medications.  (*Id.* at 652)  Plaintiff had been prescribed Focalin for her ADHD symptoms, which were deemed to be "adequately controlled" as indicated by her strong academic performance.  (*Id.*)  As for her anxiety, Dr. Gundakaram noted that Plaintiff experiences "fluctuations in [her] mood[;]" he ultimately decided to continue Plaintiff on Lexapro.  (*Id.*)

From roughly June to September 2017, Plaintiff went to live with her grandparents in Florida, but she was ultimately sent back to Delaware.  (*Id.* at 657, 660)  Throughout the fall of 2017, it was noted that Plaintiff was not compliant with her medications; when she lived with her

---

[2]    Due to the relatively narrow arguments made by Plaintiff on appeal, the Court will not restate Plaintiff's entire medical history, instead focusing on the key facts relating to Plaintiff's ADHD, ODD and anxiety disorder.

father on the weekends (Plaintiff's parents were then separated), he often would not administer her medications at all.  (*Id.* at 657, 661)

Then, in November 2017, Plaintiff was admitted to the Dover Behavioral Health Inpatient Unit for stabilization of her mood and for medication management.  (*Id.* at 657-59)  It was noted that at this time, Plaintiff was struggling with aggression, impulsivity and behavioral issues.  (*Id.* at 657)

Plaintiff was ultimately transferred to a day program at the Dover Behavioral Health Children's Partial Hospitalization Program ("Dover Behavioral Health"), where she was to work on treatment plans related to her defiance, bullying and aggressiveness.  (*Id.* at 660)  In the treatment notes regarding this outpatient program, it was noted that Plaintiff was now being prescribed a stimulant, Concerta, for her ADHD.  (*Id.* at 661)  However, the notes indicate that Plaintiff was not consistent with her medications and that she continued to bully others and leave the classroom without permission.  (*Id.*)  During the program, Plaintiff reported that she did not like being on Concerta; as a result, her doctors stopped that prescription and switched Plaintiff back to Focalin.  (*Id.*)  Although she was periodically defiant, over time, Plaintiff's behavior gradually improved, both at school and home.  (*Id.*)  In January 2018, it was determined that Plaintiff "had received [the] maximum benefit of being in [a] partial hospitalization program, [in that] her medications were stable, she was well focused and she was able to do tasks at hand."  (*Id.*)  She was discharged in February 2018 with instructions to follow up with Dr. Gundakaram and attend therapy.  (*Id.*)

Then in late May 2018, Plaintiff was voluntarily hospitalized at the Rockford Center for one week due to increasing defiance and aggression.  (*Id.* at 1231)  These symptoms had manifested in various ways, such as when Plaintiff would destroy her room or her classroom

when things did not go her way, or when she once tried to put a pencil in an electric socket.  (*Id.*)

The discharge summary from this hospitalization notes that Plaintiff "had been dealing with

some depressive symptoms" and that Lexapro was added back to her medications to address this.

(*Id.* at 1232)  It was further noted that Plaintiff "appear[ed] to handle [the Lexapro] well" and

that she was "much more cooperative and appeared to be compliant with milieu." (*Id.*)  The

Rockford Center discharged Plaintiff in early June 2018 with instructions to follow up with an

appointment at the Center for Mental Wellness, an outpatient mental health facility.  (*Id.* at 1232-

33)

The record indicates that after her hospitalization at the Rockford Center, Plaintiff's

medication and behavioral regimen became less strict.  In part this was because on the weekends,

according to Carmona, Plaintiff's father continued to fail to regularly administer Plaintiff's

medications; he also relaxed the rules in other respects when Plaintiff stayed with him.  (*Id.* at

766-67, 770, 964)  Carmona also noted that for her part, she too had "eased up" and had "let up

on some of the rules" in this time period as to Plaintiff's behavioral plan; as a result, Plaintiff's

behavior deteriorated again.  (*Id.* at 795, 800)

Plaintiff was readmitted to Dover Behavioral Health's day program in July 2018; she

stayed in that program until October 2018, when she was discharged.  (*Id.* at 795-801)  During

this time period, Plaintiff's medications were adjusted and she was reoriented to her behavioral

plan.  (*Id.* at 800)  Plaintiff worked on that plan slowly and "had ups and downs[.]"  (*Id.*)  By the

later stages of her stay, Plaintiff was "doing relatively okay" in the program, but it was noted that

Carmona wanted her to attend school.  (*Id.*)  Plaintiff was ultimately discharged with instructions

to follow up with the Center for Mental Wellness.  (*Id.* at 801)

In late 2018 through the early spring of 2019, Plaintiff's Individualized Education Program ("IEP") reports and other records indicated that Plaintiff was continuing to struggle with inattention, hyperactivity, impulsivity, and aggressive behaviors at home and at school.  (*Id.* at 406, 877-83)  They also note that Plaintiff was continuing to be noncompliant with her medications when she stayed with her father, (*id.* at 407), even though "[m]issed administration of prescribed medication appears to increase the probability of [Plaintiff's] off-task motor behavior and other problem responses throughout the school day, as well as decreasing engagement behavior[,]" (*id.* at 429 (emphasis omitted); *see also id.* at 499 (noting that missed medication was a "[s]low [t]rigger[]")).  Plaintiff's IEP reports also state that Plaintiff was doing moderately well academically at school (though she struggled in math), that she was helpful in the classroom, that she was liked by her peers, that she sometimes used negative behaviors as a way to try to gain social acceptance and that she struggled to have appropriate interpersonal relationships.  (*Id.* at 409-10, 1189)

Throughout 2018 and 2019, Plaintiff's medical and educational records indicate that her ability to complete her classwork "depend[ed] greatly on whether she has taken her medicine[.]" (*Id.* at 411)  Those records also show that Plaintiff often did not take her medication (both during the week and on the weekends), and that when this happened, the likelihood of Plaintiff exhibiting anti-social or off-task behavior dramatically increased.  (*Id.* at 877, 1213-14, 1333, 1453, 1468-69, 1521, 1580, 1968, 1976, 1979)

Additionally, throughout 2019, Plaintiff attended sessions at the Center for Mental Wellness.  There she worked on developing age-appropriate emotional regulation and emotional expression skills.  During this time period, as a general matter, Plaintiff showed improved ability

to stay on task during school with appropriate redirection, to follow instructions, and to interact appropriately with peers, teachers and family members.[3]

## 2.     The Administrative Hearing

At the second administrative hearing, which was held telephonically on June 2, 2020, the ALJ heard testimony from Carmona.  Carmona began by detailing the ways in which Plaintiff's conditions affect her home life.  Specifically, Carmona noted that she has trouble getting Plaintiff to do daily things, such as getting up out of bed, getting dressed, showering, and cleaning her room.  (*Id.* at 42-43)  Rather than completing these activities, Plaintiff will simply refuse or will need constant attention in order to complete the activities.  (*Id.*)  Carmona explained that Plaintiff ordinarily stays with her, but will stay with her father most weekends.  (*Id.* at 50-51)

Carmona also discussed Plaintiff's behavior at school and at after-school programs.  She noted that prior to in-person learning being discontinued due to COVID-19, she would receive calls from Plaintiff's school about twice a week due to Plaintiff's behavior, which included being

---

[3]     (*See, e.g.*, Tr. at 1266 (August 26, 2019 record stating that Plaintiff displayed "good sportsmanship[,]" interacted well with others, and shared without being prompted); *id.* at 1268 (August 23, 2019 record stating that Plaintiff was doing well in her classroom and that her teacher had not yet had any issues with her); *id.* at 1290 (August 15, 2019 record stating that Plaintiff got agitated at her peers but that she voiced her feelings "in a ma[nn]er that was acceptable"); *id.* at 1331 (July 22, 2019 record noting that Plaintiff struggled some with playing cooperatively, but that she was able to calm herself down before her emotions overtook her, and ultimately was able to "play nicely"); *id.* at 1340 (July 11, 2019 record stating that Plaintiff was "able to appropriately engage with peers" and that she was "cooperative"); *id.* at 1468 (May 1, 2019 record stating that Plaintiff was in a good mood and was seen socializing with her classmates); *id.* at 1484 (April 25, 2019 record stating that Plaintiff initially "g[o]t involved" in an argument between other children, but she was able to "get herself together and not get involved" and ultimately "tried to help the clients get along"); *id.* at 1535 (March 27, 2019 record stating that Plaintiff pushed another student who had yelled at her, but that she "did a good job paying attention to her teacher and participating appropriately in class discussion"); *id.* at 1591 (February 21, 2019 record stating that Plaintiff was doing her work and did not engage with other students around her who were not on task))

disrespectful, bullying and picking on other kids, and leaving the classroom when she is not supposed to.  (*Id.* at 44)  If Carmona tries to confront Plaintiff about these issues, Plaintiff will deflect and yell.  (*Id.* at 44-45)  Plaintiff has had similar trouble while attending the Boys & Girls Club in the past.  Specifically, in 2018, Boys & Girls Club employees asked Plaintiff to leave after she had an episode in which she ran around the building until staff was able to barricade her in a room.  (*Id.* at 47)  The staff called Plaintiff's mother to come get Plaintiff and explained that they simply did not have the resources to give Plaintiff the support she needs.  (*Id.*)

### 3.    The ALJ's Findings

On September 23, 2020, the ALJ issued his decision, which included the following six findings:

> 1.  The claimant was born on March 30, 2008.  Therefore, she was a school-age child on May 10, 2017, the date the application was filed, and is currently an adolescent (20 CFR 416.926a(g)(2))[4];
>
> 2.  The claimant was not engaged in substantial gainful activity since May 10, 2017, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).
>
> 3.  The claimant has the following severe impairments:  attention deficit hyperactivity disorder (ADHD) and oppositional defiant disorder (ODD) (20 CFR 416.924(c)).
>
> 4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).
>
> 5.  The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

---

[4]    Plaintiff's application actually appears to have been filed on May 26, 2017, (Tr. at 242), not May 10, 2017.  The difference is not material for purposes of this appeal, and so the Court will refer herein to the application date as May 10, 2017.

6.  The undersigned finds that the claimant has not been disabled,
as defined in the Social Security Act, since May 10, 2017, the date
the application was filed (20 CFR 416.924(a)).

(Tr. at 17-24 (emphasis omitted))

## II.   STANDARD OF REVIEW

### A.   Motion for Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil

Procedure 56.  "The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  In determining the appropriateness of summary judgment, the Court

must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-

moving party' but not weighing the evidence or making credibility determinations."  *Hill v. City*

*of Scranton*, 411 F.3d 118, 124-25 (3d Cir. 2005) (alteration in original) (quoting *Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

### B.   Review of the ALJ's Findings

The Court must uphold the Commissioner's factual findings if they are supported by

"substantial evidence[.]"  *See* 42 U.S.C. § 405(g); *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir.

2000).  "Substantial evidence" means less than a preponderance of the evidence but more than a

mere scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion[.]"  *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)

(internal quotation marks and citation omitted).  In analyzing whether substantial evidence

supports the Commissioner's factual findings, the Court may not undertake a *de novo* review of

the Commissioner's decision and may not re-weigh the evidence of record.  *See Monsour Med.*

*Ctr. v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986).  Even if the reviewing court would have

decided the factual inquiry differently, it must defer to the ALJ and affirm the Commissioner's

decision, so long as the decision is supported by substantial evidence. *Hartranft v. Apfel*, 181

F.3d 358, 360 (3d Cir. 1999); *Monsour*, 806 F.2d at 1190-91.

In addition to conducting an inquiry into whether substantial evidence supports the ALJ's

determination, the Court must also determine whether the ALJ applied the correct legal

standards. *Bierley v. Barnhart*, 188 F. App'x 117, 119 (3d Cir. 2006). The Court's review of

legal issues is plenary. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000).

## III.    DISCUSSION

In resolving the instant motions, the Court will first address the relevant law regarding

the SSI review process for child claimants. It will then go on to assess Plaintiff's arguments on

appeal.

### A.    Evaluation of Childhood Disability

The federal SSI program provides benefits to disabled individuals who meet certain

statutory income and resource limitations. 42 U.S.C. § 1381. An individual under the age of 18

is eligible for SSI if he or she has a "medically determinable physical or mental impairment,

which results in marked and severe functional limitations, and which can be expected . . . to last

for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). The SSA

establishes a three-step sequential evaluation process for determining whether the child is

disabled within the meaning of the statute. Here, the ALJ must assess whether the child: (1) is

working and is engaged in substantial gainful activity (if so, the child is not disabled, but if not,

the ALJ proceeds to step two); (2) has a severe physical or mental impairment or combination of

impairments (if not, then the child is not disabled; if so, then the ALJ proceeds to step three); and

(3) has an impairment or combination of impairments that meets, medically equals, or

functionally equals a listed impairment (if not, then the child is not disabled; if so, then the child

is disabled).  20 C.F.R. § 416.924(b)-(d); *see also T.C. ex rel Z.C. v. Comm'r of Soc. Sec.*, 497 F.

App'x 158, 160-61 (3d Cir. 2012).[5]

### B.      Plaintiff's Arguments on Appeal

On appeal, Plaintiff presents three arguments:  (1) that the ALJ erred in different ways by

failing to consider her anxiety disorder, (2) that the ALJ erred by failing to consider whether

there was any "closed" 12-month period in which Plaintiff was disabled, and (3) that the ALJ

and Appeals Council were not properly appointed, such that they had no authority to adjudicate

this case.  (D.I. 15 at 1)  The Court will address these arguments in turn.

### 1.      Is Remand Required Due to the ALJ's Failure to Consider Plaintiff's Anxiety Disorder?

In his decision, the ALJ found that Plaintiff was not engaged in substantial gainful

activity at step one.  (Tr. at 17)  Next, at step two, he concluded that Plaintiff had two severe

impairments:  ADHD and ODD.  (*Id.*)  Those step one and step two findings are not challenged

on appeal; instead, the ALJ's work at step three is what is at issue here.[6]

---

[5]       Below, the Court will discuss further the process used to determine whether a
child's impairment(s) meets or medically equals a listing.  As for the process used to assess
whether a child's impairment(s) "functionally equals" a listed impairment, there the ALJ
evaluates how the child functions in six domains:  (1) acquiring and using information; (2)
attending to and completing tasks; (3) interacting and relating with others; (4) moving about and
manipulating objects; (5) caring for yourself; and (6) health and physical well-being.  20 C.F.R.
§ 416.926a(b)(1)(i)-(vi).  The ALJ compares the child's functioning to children of the same age
who do not have impairments.  20 C.F.R. §§ 416.924a(b)(3) & 416.926a(b).  An impairment
functionally equals a listing if the child has "marked" limitations in at least two domains, or an
"extreme" limitation in at least one domain.  20 C.F.R. § 416.926a(a).  If the child has an
impairment that functionally equals the requirements of a listing and also satisfies the durational
requirement, the child will be found to be disabled.  20 C.F.R. § 416.924(d)(1).

[6]       In a portion of her opening brief, Plaintiff appeared to also be making a step two-
related argument as an additional basis for remand.  This came when Plaintiff asserted that "[t]he

Plaintiff's first argument on appeal relates to the undisputed fact that when discussing the evidence at step three, the ALJ failed to explicitly discuss or consider Plaintiff's anxiety disorder. Plaintiff focuses on two separate alleged problems that ostensibly flowed from this failure to mention the disorder:  (1) that the ALJ's failure to consider Plaintiff's anxiety-related functional limitations at step three amounted to legal error; and (2) that the ALJ's failure to consider Plaintiff's anxiety meant that the ALJ failed to assess whether Plaintiff met or medically equaled certain applicable listings.  (D.I. 15 at 3-9)  The Court will address each of these positions below.

> **a.      Did the ALJ's Failure to Discuss Plaintiff's Anxiety Disorder and Related Limitations Amount to Legal Error, and If So, Did This Failure Amount to Harmless Error?**

---

ALJ's *failure to explain why he did not find [Plaintiff's] anxiety to be a severe impairment* was legal error."  (D.I. 15 at 4 (emphasis added))  In making this argument, Plaintiff faulted the ALJ for not properly assessing the opinion of Dr. Alex Siegel, Ph.D., who found, in a May 7, 2018 opinion, that Plaintiff's anxiety was in fact a severe impairment.  (*Id.*)  Yet in Plaintiff's reply brief, Plaintiff stated that the Commissioner had "misconstrue[d] [Plaintiff's] allegations [in her opening brief] as an argument that *anxiety should have been considered a severe impairment by the ALJ*"; Plaintiff claimed that she "*has not alleged that her anxiety impairment was necessarily severe*" and instead only meant to argue that "the ALJ failed to assess any of the evidence regarding her anxiety disorder or mention its existence" in the evaluation process.  (D.I. 22 at 1 (emphasis added))

It is hard to see how the Commissioner "misconstrue[d]" Plaintiff's argument in her opening brief, since in that brief, as noted above, Plaintiff did seem to be overtly suggesting that the ALJ committed error by not finding her anxiety to be a "severe" impairment at step two (and by disagreeing with Dr. Siegel's conclusion to the contrary).  But in any event, with Plaintiff having explicitly disclaimed such a step two argument in her reply brief, it is now waived.

Moreover, even were the argument not waived, and even if it was error for the ALJ to have failed to credit Dr. Siegel's view of Plaintiff's anxiety as being a severe impairment at step two, this failure, in and of itself, would amount to harmless error.  *See infra* at pp. 13-14 (discussing the harmless error standard).  That is because the ALJ found in Plaintiff's favor at step two and determined that Plaintiff suffered from certain other severe impairments (i.e., ADHD and ODD), such that the ALJ then moved on to step three of the analysis.  *Cf. Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007).  Additionally, the Court notes that in his opinion, Dr. Siegel ultimately explained that even though he considered Plaintiff's anxiety to be severe, he did not believe that any of Plaintiff's impairments (including her anxiety) met, medically equaled, or functionally equaled a listing.  (Tr. at 107-08)

Plaintiff initially asserts that the ALJ's failure to assess or mention Plaintiff's anxiety disorder and her related functional limitations amounted to legal error at step three. (D.I. 15 at 3-4; *see also* D.I. 22 at 1 (faulting the ALJ for failing to "assess any of the evidence regarding [the anxiety] disorder")) Defendant counters by arguing that the ALJ's failure to discuss Plaintiff's anxiety disorder at step three is harmless error, since the ALJ otherwise considered Plaintiff's anxiety-related functional limitations at that step. (D.I. 19 at 12-13) The Court agrees with Defendant.

As an initial matter, the Commissioner's regulations require that an ALJ evaluate all of a claimant's asserted impairments and consider the combined effect of those impairments upon the claimant's overall health and functioning. 20 C.F.R. § 416.924(a). Plaintiff listed anxiety disorder as one of her impairments in her SSI application. (Tr. at 267) And so the ALJ should have considered that impairment, and any limitations deriving from the impairment, during his evaluation process, including at step three. The failure to do so amounted to legal error. This is not in dispute here.

That said, courts have explained that even if an ALJ makes an error like this one, remand is not required if the error is harmless. Such an error is harmless if it "would not affect the outcome of the case." *Rutherford*, 399 F.3d at 553; *see also Holloman v. Comm'r of Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016) (noting in a Social Security disability case that an ALJ's error would be harmless if it "could [not] have made any difference" in the ultimate outcome of the disability calculus) (internal quotation marks and citations omitted); *Newsome ex rel. Bell v. Barnhart*, 444 F. Supp. 2d 1195, 1201 (M.D. Ala. 2006) (concluding that the ALJ's failure to explicitly consider the minor claimant's ODD at or beyond step two amounted to harmless error,

13

where the ALJ nevertheless assessed evidence of the claimant's oppositional behavior at step three). That is the case here.

Here, the difficulty with Plaintiff's position is that she has not clearly identified any functional limitations stemming from her anxiety disorder that the ALJ *did not otherwise identify and address at step three*. Instead, Plaintiff's argument seems simply to be that the ALJ technically erred in not discussing her anxiety, and that therefore, the Court should remand for that reason alone. (D.I. 15 at 3; D.I. 22 at 1) But that type of assertion ignores the concept of "harmless error" altogether.

That this is the correct decision can be seen by reviewing the relevant portions of Plaintiff's opening brief. Therein, Plaintiff mentions some functional limitations that she claims are associated with her anxiety disorder: i.e., that the disorder made her "'very emotional[,]'" (D.I. 15 at 3 (quoting Tr. at 267)), and that it "trigger[ed] tantrums and aggressive outbursts[,]" (*id.* (quoting Tr. at 580-83, 622-24, 646-49, 650-53)). But even assuming that these limitations do in fact flow from her anxiety disorder (as opposed to her other limitations, such as ODD), the Court must still conclude that the ALJ's error was harmless. That is because the ALJ thoroughly analyzed evidence of these very functional limitations when considering the impact of Plaintiff's ADHD and ODD at step three. The ALJ did so in various ways.

For example, the ALJ recognized Plaintiff's emotional nature, her tantrums and her aggressive conduct when noting the following testimony from Carmona:

- Plaintiff "has difficulty relating with others and acts out aggressively towards peers and teachers[.]"

- Plaintiff "is aggressive towards her siblings [such that she] must [be kept] separated from her siblings[.]"

14

- "[T]eachers complain about the claimant bullying, being disrespectful, and walking out of the classroom."

- Plaintiff's "aggressive behaviors and inability to play appropriately" impact her social life.

- "[C]laimant will not get out of bed in the morning and refuses to take a shower or get ready for school."

- "[C]laimant was kicked out of the Boys and Girls Club because she ran out of the classroom and needed to be barricaded in a room[.]"

- "[C]laimant will 'scream, run, and yell' when asked to do something she does not want to do[.]"

- "[C]laimant displays aggressive and defiant behaviors[,] including throwing books at teachers and walking out of the classroom[.]"

(Tr. at 19-20)

Beyond this testimonial evidence, the ALJ considered statements in Plaintiff's medical records that addressed these same symptoms. For example, the ALJ noted that Plaintiff had an IEP for "behavioral and emotional issues[.]" (*Id*. at 20) He referenced a June 13, 2018 "Progress Note" from Dr. Gundakaram, in which the physician detailed Plaintiff's aggressive, emotional behavior and her tantrums. (*Id.* (citing *id.* at 964 (noting, among other things, that Plaintiff had to be admitted to the Rockford Center "due to unsafe behavior at school[, including] throwing books at the teachers[ and] sticking things in the electric sockets" and that she "was running around[ the Boys and Girls Club,] tearing things off the wal[l]s and had to be restrained")) And the ALJ considered treatment notes from Plaintiff's July 2018 hospitalization at Dover Behavioral Health, which "reflect multiple episodes when the claimant had to be restrained due to aggressive behaviors and refusing to take her medications[.]" (*Id.* at 21 (citing *id.* at 1234-46))

15

In short, the record is clear that the ALJ repeatedly discussed and carefully considered evidence relating to each of the types of functional limitations that Plaintiff asserts are connected to her anxiety disorder.  After doing so, the ALJ explained why, despite that evidence, he concluded that Plaintiff did not have an impairment or combination of impairments that met, medically equaled, or functionally equaled the severity of the listings.  (*Id*. at 17-23)  In light of this, the Court cannot say that the ALJ's failure to consider Plaintiff's anxiety-related limitations at step three amounted to anything other than harmless error.  Put differently, even were the case to be remanded to the ALJ so that he could explicitly consider the limitations that flow from Plaintiff's anxiety disorder, this would simply mean that the ALJ would be re-assessing the impact of the *very same symptoms* that he had already taken into account when evaluating Plaintiff's ADHD and ODD.  And so the Court does not see how remand could affect the ultimate outcome here.  (D.I. 19 at 13)[7]

> **b.** **Did the ALJ Err at Step Three by Failing to Consider an Applicable Listing?**

The Court next addresses Plaintiff's other argument regarding her anxiety disorder:  that the ALJ's failure to discuss the condition led him to ignore the applicability of appropriate

---

[7]     *Cf. Henry v. Saul*, Case No. 3:19-cv-00890-NLS, 2020 WL 7013588, at *15 (S.D. Cal. Nov. 25, 2020) ("Accordingly, whatever error the ALJ may have made with regard to not specifically mentioning anxiety, the error was harmless as the ALJ appropriately considered Plaintiff's mental health impairments generally."); *Chandler v. Colvin*, No. 8:13-cv-01331-DCN, 2014 WL 4809902, at *16 (D.S.C. Sept. 26, 2014) ("Although the ALJ did not mention anxiety as a separate impairment, Plaintiff has failed to indicate any limitation caused by anxiety that was not considered by the ALJ in addressing Plaintiff's limitations caused by PTSD."); *Barraza v. Comm'r of Soc. Sec.*, No. CIV S-09-1050-CMK, 2012 WL 1130644, at *6 (E.D. Cal. Mar. 30, 2012) ("[E]ven if the ALJ should have found plaintiff's diabetes, anxiety and/or obesity to be severe impairments, his failure to do so was harmless error since plaintiff 'has not set forth, and there is no evidence in the record, of any functional limitations as a result of [his] [impairments] that the ALJ failed to consider.'") (quoting *Burch v. Barnhart*, 400 F.3d 676, 682-84 (9th Cir. 2005)) (alterations in original).

listings at step three.  The Court will begin with a brief recitation of the mechanics of the step

three analysis, in order to provide the context necessary to understand Plaintiff's argument.  Then

it will explain why Plaintiff's argument is not well taken.

### i.      The Step Three Analysis

As discussed above, at step three, an ALJ considers whether the claimant has an

impairment or combination of impairments that, *inter alia*, meets or medically equals the

severity of an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  20 C.F.R. § 416.924(d).

If the ALJ determines the claimant's impairment or combination of impairments meets or

medically equals a listing, then the claimant is considered disabled.  20 C.F.R. § 416.924(d)(1).

In assessing whether this is the case, the ALJ is directed, pursuant to the SSA, to consider

various criteria, depending on the disorder at issue.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §

112.00(A)(2).  This analysis generally includes consideration of some combination of the

"paragraph A," "paragraph B," and/or "paragraph C" criteria.  Specifically, in order to meet or

medically equal certain listings, including listing 112.08 (personality and impulse-control

disorders) and 112.11 (neurodevelopmental disorders)—the two listings that the ALJ explicitly

addressed in his decision here—a claimant must satisfy the requirements of both paragraphs A

and B.  Yet to meet or medically equal certain other listings—such as listing 112.04 (depressive,

bipolar and related disorders) and 112.06 (anxiety and obsessive-compulsive disorders), which

Plaintiff discusses in her appeal—a claimant can satisfy the requirements of either paragraphs A

and B *or* the requirements of paragraphs A and C.  *Id.*

Paragraph A of each listing provides a set of medical criteria that must be present in a

claimant's medical history.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(A)(2)(a).  For

instance, a claimant asserting that they have a condition meeting or equaling listing 112.08 must

17

establish that they suffered from one of nine different possible criteria, including distrust and

suspiciousness of others, detachment from social relationships, disregard for and violation of the

rights of others, instability of interpersonal relationships and excessive emotionality and attention

seeking.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.08(A).  Next, the paragraph B criteria are

meant to be used to assess how a claimant's mental disorder limits his or her functioning.  20

C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(A)(2)(b).  To that end, the paragraph B criteria are the

four major areas of mental functioning used to evaluate mental impairments:  (1) understanding,

remembering, or applying information; (2) interacting with others; (3) concentrating, persisting

or maintaining pace; and (4) adapting or managing oneself.  20 C.F.R. Pt. 404, Subpt. P, App. 1,

§ 112.00(E).  A claimant must establish "marked" limitations in two of the paragraph B criteria

or an "extreme" limitation in one paragraph B criteria.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §

112.00(A)(2)(b).  Finally, the paragraph C criteria are used to assess whether a claimant suffers

from a "serious and persistent mental disorder[.]"  20 C.F.R. Pt. 404, Subpt. P, App. 1, §

112.00(A)(2)(c).  The paragraph C criteria are described as follows:

> a. We find a mental disorder to be "serious and persistent" when
> there is a medically documented history of the existence of the
> mental disorder . . . over a period of at least 2 years, and evidence
> shows that your disorder satisfies both C1 and C2.
>
> b. The criterion in C1 is satisfied when the evidence shows that
> you rely, on an ongoing basis, upon medical treatment, mental
> health therapy, psychosocial support(s), or a highly structured
> setting(s), to diminish the symptoms and signs of your mental
> disorder. . . .  We consider that you receive ongoing medical
> treatment when the medical evidence establishes that you obtain
> medical treatment with a frequency consistent with accepted
> medical practice for the type of treatment or evaluation required
> for your medical condition. . . .
>
> c. The criterion in C2 is satisfied when the evidence shows that,
> despite your diminished symptoms and signs, you have achieved

only marginal adjustment. "Marginal adjustment" means that your adaptation to the requirements of daily life is fragile; that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life.  We will consider that you have achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of your symptoms and signs and to deterioration in your functioning[.] . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(G)(2); *see also id.* § 112.00(A)(2)(c).

### ii.    Discussion

Having set out the applicable legal framework, the Court will now address Plaintiff's argument here.  The ALJ considered two mental health listings at step three:  listing 112.08 and listing 112.11.  (Tr. at 17-18)  As discussed above, in order to meet these two listings, a claimant must satisfy both paragraph A and paragraph B criteria.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(A)(2); *see also id.* §§ 112.08 & 112.11.  The ALJ did not ultimately conduct an analysis of the paragraph A criteria because he found that Plaintiff could not satisfy the paragraph B criteria, in that Plaintiff did not have marked limitations in any two of the areas of mental functioning, nor an extreme limitation in any one of those areas.  (Tr. at 17-18)  The ALJ reached this decision, in part, due to record evidence that Plaintiff's conditions were "well controlled when the claimant takes her medication[.]"  (*Id.* at 18)

Plaintiff asserts that the ALJ's failure to consider her anxiety disorder caused the ALJ to fail to consider the applicability of two other listings:  the listing for depressive disorders (listing 112.04) or anxiety disorders (listing 112.06).  (D.I. 15 at 5)  This error was not harmless, according to Plaintiff, because the criteria used to consider listings 112.04 or 112.06 are different from those used to assess listings 112.08 and 112.11—in that for the former, a claimant may establish that she meets the listing by showing she meets either the criteria in paragraphs A and

B *or* in paragraphs A and C.  Since the ALJ analyzed neither paragraph A nor C criteria, Plaintiff argues that the ALJ did not appropriately consider whether she met or medically equaled listings 112.04 or 112.06.  (*Id.* at 6-7)  She claims this failure necessitates remand, in that her mental impairments would have met the paragraph A and C criteria, had those criteria been evaluated at step three.[8]  (*Id.* at 7; *see also id.* at 8-9)

In addressing Plaintiff's argument, the Court first notes that it is surely possible that an ALJ's failure to consider a particular impairment at step three—and relatedly whether the symptoms relating to that impairment meet or medically equal the severity of a listing—can constitute reversible error.  *See Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir. 2000); *see also Ribaudo v. Barnhart*, 458 F.3d 580, 583-84 (7th Cir. 2006) (ordering remand where the claimant argued that his back injury met or equaled listing 1.04A, but the ALJ failed to mention that specific listing in his decision, and the ALJ did not evaluate any evidence that might have been favorable to the claimant regarding that listing).  On the other hand, if the record clearly shows that a claimant could not have met the requirements of a particular listing, then the ALJ's failure to reference or assess the elements of that specific listing amounts to harmless error.[9]

---

[8]    Plaintiff does not dispute the ALJ's findings that Plaintiff's symptoms did not satisfy the paragraph B criterion.

[9]    *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 733-34 (10th Cir. 2005) (affirming the denial of the plaintiff's claims, notwithstanding the ALJ's failure to explicitly perform an analysis as to the applicability of a particular listing, and concluding that such error was harmless "where, based on material the ALJ did at least consider (just not properly), [the Court] could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way"); *cf. Rice v. Barnhart*, 384 F.3d 363, 369-70 (7th Cir. 2004) (affirming the denial of a disability insurance benefits claim despite the ALJ's failure to mention the applicable listing for purposes of comparison, where the evidence in the record "reveal[ed] that [the plaintiff] did not meet *all* of the criteria [of that listing], as required")

20

This case falls into the latter bucket.  That is, the ALJ's failure to explicitly consider whether Plaintiff's anxiety disorder-related symptoms (alone or in combination with her other limitations) meant that she met or medically equaled listings 112.04 and 112.06 was harmless.  This is because, as Defendant argues, the record is sufficiently clear Plaintiff would have been unable to meet the C1 criterion for those listings.

Again, the C1 criterion is met when a claimant establishes that they rely on medical treatment that is ongoing and that diminishes the symptoms and signs of the disorder.  But in assessing this criterion, ALJs are directed to "consider periods of inconsistent treatment or lack of compliance with treatment that may result from your mental disorder[.]"  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(G)(2)(b).[10]  Here, the record reflects that Plaintiff was on several medications, including some medications that were specifically geared toward her anxiety.  Yet, as Defendant argues, (D.I. 19 at 14-15), and as the ALJ discussed throughout his analysis, (Tr. at

---

(emphasis in original, alteration in original); *Jones v. Barnhart*, 364 F.3d 501, 503-05 (3d Cir. 2004) (rejecting the claimant's argument that the ALJ erred by failing to find that she was *per se* disabled under listing 3.02(A), even where the ALJ did not mention that particular listing by name, where the ALJ's "decision, read as a whole" indicated that the ALJ reviewed medical evidence relevant to the listing, and concluded, "after carefully compar[ing] the claimant's signs, symptoms, and laboratory findings with the criteria specified in all of the Listings of Impairments, the claimant's impairments do not meet or equal the criteria established for an impairment shown in the Listings"; the Third Circuit noted that an ALJ need not "use particular language or adhere to a particular format in conducting his analysis" so long as he "ensure[s] that there is sufficient development of the record and explanation of findings to permit meaningful review") (internal quotation marks and citations omitted).

[10]     Although the SSA directs ALJs to consider such evidence, it also states that "[i]f the evidence indicates that the inconsistent treatment or lack of compliance is a feature of your mental disorder, . . . we will not use it as evidence to support a finding that you have not received ongoing medical treatment as required by [paragraph C.]"  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(G)(2)(c).  There is no evidence in the record to suggest that Plaintiff's lack of compliance with her medication regimen was a result of her mental disorders, nor did Plaintiff suggest this in her briefing or point to any evidence in support in that briefing.

18-23), the record demonstrates that Plaintiff repeatedly failed to take that medication as required, and otherwise failed to comply with her treatment plans.  The evidence supporting this conclusion is ample.

For example, in his decision, the ALJ cited to multiple medical records that note how Plaintiff's father did not provide Plaintiff with her medication on the weekends.  (*See, e.g.*, *id.* at 964 (June 2018 report indicating that "[m]other states that [Plaintiff's] father does not administer the medications while she is with him on the weekends.") (*cited in id.* at 22); *id.* at 1045 (August 2018 report stating that "Carmona reported that [Plaintiff's] father often does not give her medications to her, and generally the rules are more relaxed when she is with her father.") (*cited in id.* at 22))  Indeed, the record contains many additional records, not cited by the ALJ, that note the same thing.  (*See, e.g.*, *id.* at 407, 766-67, 770)

Additionally, the ALJ cited to numerous medical records demonstrating that:  (1) when Plaintiff took her medication, she was generally compliant but (2) Plaintiff often did not take her medication or maintain her treatment plan (both when she was staying with her father and when she was staying with her mother), and (3) when she was off her medication, Plaintiff tended to engage in aggressive, emotional, off-task or disruptive behavior.  Among these records are the following (with notations as to where they were cited by the ALJ in his decision):

- A July 2018 psychiatric assessment, which came just before Plaintiff's admittance to the outpatient hospitalization program at Dover Behavioral Health, noting that prior to admission, Plaintiff's mother "'eased up' and did not follow[ ]through with behavioral plans [earlier provided by Dover Behavioral Health]."  These records further note that Plaintiff's mother "let up on some of the rules, which may have contributed to patient reverting to old oppositional behaviors."  (*Id.* at 795, 800 (*cited in id.* at 21))

22

- An October 2018 discharge summary from Dover Behavioral Health, stating that during the course of her treatment, Plaintiff had to be restrained due to aggressive behavior at a time when she was "refusing to take scheduled medications[.]"  (*Id.* at 1244 (*cited in id.* at 21))

- A December 2018 behavioral assessment report, explaining that Plaintiff thinks she has the most difficulty with wanting to leave class and with paying attention in class "when she doesn't take her medication that day" and that "due to busy morning routines, medication administration is forgotten[.]" The writer later explains that Plaintiff's "on-task behavior was notably lower during observations without medication, and her off-task motor behavior was notably higher during observations without medication."  (*Id.* at 1213-14 (*cited in id.* at 18, 20-22))

- A March 2019 IEP that noted how Plaintiff's behavior "depends greatly on whether she has taken her medicine[.]" (*Id.* at 1191 (*cited in id.* at 18, 20-21))

- An October 2019 questionnaire, completed by Plaintiff's special education teacher and case manager, concluding that Plaintiff's "functioning change[s] after taking medication[.]" (*Id.* at 374 (*cited in id.* at 23))

And there are many, many other notations in the record that were not specifically cited by the ALJ for this purpose, but that demonstrate the very same thing.[11]

---

[11]   (*See, e.g.*, Tr. at 429 (Delaware Department of Education report stating that "[m]issed administration of prescribed medication appears to increase the probability of off-task motor behavior and other problem responses throughout the school day, as well as decreasing engagement behavior"); *id.* at 1229 (April 2019 medical report noting that Plaintiff is "a lot different when she is on her medications th[a]n when she is off them"); *id.* at 1333 (July 2019 medical report noting that Plaintiff missed her medication and that she was "hyperactive" and needed help staying focused or calming down); *id.* at 1468-69 (May 2019 medical report noting that Plaintiff was "struggling with her impulse control" due to a missed dose of medication); *id.* at 1521 (March 2019 medical report noting that Plaintiff struggled with defiant behavior (e.g., leaving the classroom and ignoring her teacher) on a day when she missed her medication); *id.* at 1579-80 (March 2019 medical report stating that Plaintiff struggled with impulse control and emotional outbursts on a day when she missed her medication); *id.* at 1968 (November 2019 medical report noting that Plaintiff's teachers assumed that Plaintiff had not been taking her medication, and that Plaintiff had been hyperactive throughout the school day); *id.* at 1976

23

Moreover, the ALJ cited to an April 2018 Teacher Questionnaire from one of Plaintiff's teachers, Jacqueline Knox (the "Knox Questionnaire"), for the proposition that when Plaintiff took her medication and engaged with her treatment plan, she was more functional in and out of the classroom.  (*See, e.g.*, *id.* at 22-23)  In the Knox Questionnaire, Ms. Knox ("Knox") considered, among other things, Plaintiff's ability to:  (1) acquire and use information, (2) attend and complete tasks, (3) interact and relate with others, and (4) care for herself.  (*Id.* at 297-301)  Applying a scale of rating levels 1-5, where "1" equates to "[no] problem" and "5" equates to "[a] very serious problem[,]" Knox concluded that Plaintiff did not have a problem greater than a rating level 3 (i.e., "[a]n obvious problem").  (*Id.*)  In support of her conclusion, Knox stated that Plaintiff's "behavior greatly impacts her learning *when she is unmedicated.  When she is unmedicated, her ratings [] would be considered a 4 or a 5.  If she is consistently getting the appropriate medication, the ratings would be what is shown."  (*Id.* (emphasis added))  Knox

---

(October 2019 medical report noting that Plaintiff was hyperactive and stated that she did not get her medication that morning); *id.* at 1979 (October 2019 medical report in which Plaintiff's teacher stated that "she can tell [her] client did not have her medication today"); *id.* at 2033 (September 2019 medical record noting that Plaintiff came to school that day without her medication))

   The Court notes that in many of the reports cited in this footnote and in this subsection, Plaintiff, her mother, her teachers and/or her medical providers do not distinguish between Plaintiff's failure to take medication for her anxiety disorder, as opposed to her failure to take medication relating to her other medical impairments (such as ADHD).  Often, the reports simply and generally note that Plaintiff failed to take her "medication" or her "meds."  But nowhere in her briefing does Plaintiff suggest that the record evidence of non-compliance with taking medication was somehow different regarding Plaintiff's anxiety-related medication, as compared with medication for Plaintiff's other medical impairments.  Indeed, as noted above, Plaintiff asserted in her opening brief that her anxiety disorder manifests in tantrums and aggressive outbursts, (D.I. 15 at 3), and in many of the medical reports cited above, Plaintiff's failure to take her daily medication was said to give rise to just such behavior.

24

further noted that Plaintiff "is 100% independent (*when medicated*)." (*Id.* at 299 (emphasis added))

Thus, even if the Court were to remand for the ALJ to explicitly consider whether Plaintiff met or equaled the criteria for mood-related listings 112.04 or 112.06 at step three, that would not change the disability outcome here, because Plaintiff could not establish that she met the paragraph C1 criterion.[12]   Therefore, remand is unnecessary on this ground too. *See Lete v. Colvin*, Civil No. 14-66-GFVT, 2015 WL 4548736, at *2-3 (E.D. Ky. July 28, 2015) (concluding that the ALJ's failure to expressly consider the applicability of the listing for intellectual disability was harmless error, where the record indicated that claimant would not have been able to meet the "valid verbal, performance or full scale IQ of 60 through 70" requirement of the listing anyway); *see also Kelley S. v. Comm'r of Soc. Sec.*, 5:17-CV-1234 (ATB), 2019 WL 529909, at *8-9 (N.D.N.Y. Feb. 11, 2019); *Layton ex rel. B.O. v. Colvin*, No. 12-12934, 2013 WL 5372798, at *8, 14-15 (E.D. Mich. Sept. 25, 2013); *Bigham v. Astrue*, No. 11-CV-3359, 2013 WL 1290001, at *10-11 (C.D. Ill. Jan. 30, 2013).

>    **2.   Did the ALJ Fail to Consider Whether There Was Any 12-Month "Closed Period" in Which Plaintiff was Disabled, or, if the ALJ Did Consider this Question, Was His Decision that No Such Period Existed Unsupported by Substantial Evidence?**

---

[12]    In her reply brief, Plaintiff did not actually respond to the substance of Defendant's argument that she would be unable to meet the paragraph C1 criterion due to her failure to consistently take medication and adhere to treatment plans.  Instead, Plaintiff only argued that remand is warranted due to the sole fact that the ALJ did not explicitly consider whether she met the listing 112.04 or 112.06 criteria.  (D.I. 22 at 1-4)  But that ignores Defendant's argument about harmless error.  The harmless error analysis necessarily requires an assessment of whether portions of the record (even if they were not explicitly addressed by the ALJ in his decision) nevertheless make abundantly clear that Plaintiff's argument on appeal would fail if remand occurred.  *See e.g.*, *Fischer-Ross*, 431 F.3d at 733-34.

The Court next addresses Plaintiff's second argument.  According to Plaintiff, the ALJ should have (but did not) consider whether there was any specific 12-month stretch during the relevant time frame in which Plaintiff qualified for a "closed period" of disability (i.e., wherein Plaintiff was disabled during that 12-month period, even if, at some later point, the Plaintiff's disability may have ceased).  (D.I. 15 at 9-12)  For the reasons that follow, the Court concludes that the ALJ did not commit any error in this regard.

As an initial matter, the Court agrees with Defendant that the ALJ actually did (at least implicitly) make a finding that Plaintiff was not disabled for any 12-month "closed period" in the relevant time frame.  (D.I. 19 at 15)  This is confirmed by the fact that the ALJ concluded that Plaintiff "has not been disabled . . . since May 10, 2017[ the application date.]'"  (Tr. at 24); *see also Ward v. Kijakazi*, Civil Action 20-1315, 2021 WL 3037711, at *2 (W.D. Pa. July 19, 2021) ("I find that the ALJ implicitly denied a closed period of disability. . . .  A finding that the claimant has not been disabled during the entire period from the alleged onset date forward necessarily precludes a finding that [a claimant] was entitled to a closed period of disability.") (citing *Phillips v. Barnhart*, 91 F. App'x 775 (3d Cir. 2004)).

In response, Plaintiff argues that even if the ALJ did conclude that Plaintiff was not disabled for any closed 12-month period after May 2017, then the ALJ was simply wrong in coming to that conclusion.  In this regard, Plaintiff notes that when the ALJ explained why Plaintiff's limitations did not meet, medically equal or functionally equal any listing, the ALJ consistently relied on the fact that Plaintiff's symptoms were well controlled when she took her medication.  (D.I. 15 at 11 (citing Tr. at 18-23))  But Plaintiff argues that the ALJ over-relied on the effectiveness of Plaintiff's medications during this time period, and failed to consider "the absolute failure of [those medicines] from 2017 through early 2019."  (*Id.* at 9-10)  In support of

the idea that her medications failed to sufficiently control her negative behaviors, Plaintiff points

out that her physicians adjusted her medication regimen a few times between 2017 to 2019.  (*Id.*

at 10)  She argues that this means that those medications were clearly ineffective—particularly in

light of her multiple hospitalizations during that same stretch.  (*Id.*)  In sum, Plaintiff states that

when the ALJ concluded that she was not disabled for any 12-month period in the relevant time

period, that decision was based on the incorrect assumption that "[Plaintiff's medication]

treatment was always effective and [that] simply taking medication would prevent her from

experiencing the mental functional limitations she alleged[.]"  (*Id.* at 10-11; *see also id.* at 11

(Plaintiff arguing that these "multiple medication changes . . . indicated that there was a time

period of at least 12 months w[h]ere [Plaintiff's] treatment needs were unclear and unmet by

medications"))

        To start, the Court acknowledges that it is possible that Plaintiff *could be* correct.  That is,

Plaintiff cites to some record evidence that, if it were read a certain way, might support her

viewpoint.  For example, it is true that during her outpatient program at Dover Behavioral Health

from November 2017 through February 2018, Plaintiff's doctors switched her from taking

Concerta for her ADHD to taking Focalin; her Focalin prescription was later increased from 15

mg to 20 mg.  (Tr. at 1238 (*cited in* D.I. 15 at 10))  Additionally, during Plaintiff's May 2018

intake at the Rockford Center, it was noted that Plaintiff "has been on medications for some

time[,]" but nevertheless had recently displayed newly aggressive behavior; while at Rockford

Center, Plaintiff was additionally prescribed 1 mg of Tenex per night and 5 mg of Lexapro daily.

(*Id.* at 1231-33 (*cited in* D.I. 15 at 10))  And during her second outpatient stay at Dover

Behavioral Health, Plaintiff was later switched off of Focalin in favor of Concerta; her Lexapro

was also discontinued in favor of Xanax, and later for melatonin.  (*Id.* at 1245-46 (*cited in* D.I.

15 at 10))  So looked at one way, the fact that physicians repeatedly changed the medications

Plaintiff was taking for ADHD, ODD and anxiety, coupled with the fact that Plaintiff continued

to have behavioral struggles during this time, could suggest that the medications (even had they

been taken religiously) simply did not work well enough to ward off negative behaviors.

But the key point here is that there are other portions of the record, cited by the ALJ in

his decision, that render a different conclusion *at least equally plausible*—i.e., that Plaintiff's

failure to consistently take her medication is what caused or exacerbated many of her problems.

As the Court has already noted above, the record contains much evidence that from 2017 through

the end of 2019, Plaintiff did not in fact consistently take her medications.  And the record also

clearly and repeatedly indicates that Plaintiff, her mother, her educators and her physicians all

believed that there was a direct link between Plaintiff's failure to take her medication and her

off-task or disruptive behaviors.  *See supra* pp. 22-25 (citing Tr. at 374, 429, 1191, 1213-14,

1229, 1244, 1333, 1468-69, 1521, 1579-80, 1968, 1976, 1979, 2033).  This was certainly the

view that Plaintiff's teacher, Ms. Knox, also provided in her questionnaire.  (Tr. at 297-301

(noting that "when medicated" Plaintiff was "100% independent" but that when "unmedicated"

her functioning decreased significantly))

Indeed, even a close look at some of the evidence *Plaintiff* cites in support of her contrary

theory (i.e., that the medication she was taking was simply ineffective) could actually be viewed

as cutting in Defendant's favor.  For example, as noted above, Plaintiff references the fact that

during her first stay in outpatient treatment at Dover Behavioral Health (spanning from

November 2017 to February 2018), she was switched from taking Concerta to Focalin, and that

her Focalin was increased.  The relevant treatment notes indicate that in the first month of that

stay, Plaintiff was exhibiting bullying, aggressive behavior and was at times emotionally

unstable.  (*Id*. at 660-61)  But those notes also state that, in that same time period, Plaintiff "has

not been consistent with her medications[.]"  (*Id*. at 661)  In the weeks that followed, Plaintiff

continued to destroy property, use profanity and was unable to focus.  (*Id*.)  But again, the notes

indicate that during this time, it "was not clear if [Plaintiff] was taking medications as prescribed

or not."  (*Id*.)  When Plaintiff later made the switch from Concerta to Focalin, the listed reason

was *not* that doctors felt that the Concerta was ineffective when taken.  Instead, it was that "the

patient did not like being on Concerta[.]"  (*Id*.)  And after being placed on Focalin, the treatment

notes indicate that Plaintiff's behavior "improved both at home and school[,]" that she "made

significant progress and was expressing herself better[,]" and that upon her discharge, her

"medications were stable, she was well focused and she was able to do tasks at hand."  (*Id*.)

When read in this light, the above evidence seems to suggest just what Defendant argues:  that

when Plaintiff failed to take her medication, her symptoms increased; when she took the

medication, her symptoms decreased, and her demeanor improved.[13]

---

[13]        The record from Plaintiff's second outpatient stay at Dover Behavioral Health
could be read in a similar way.  The treatment notes regarding that stay state that prior to
Plaintiff's re-admission there in July 2018, Plaintiff's behavior had "decompensated"—but that
this was at least in part because her mother "acknowledged that she let up on some of the rules,
which may have contributed to patient reverting to old oppositional behaviors."  (Tr. at 1245)
Yet while it is true (as Plaintiff notes) that Plaintiff's medication regimen was altered during that
stay, such that her prescription for Focalin was discontinued and replaced by a prescription for
Concerta, the notes indicate that this change was made because Plaintiff "stated that she does not
feel the [Focalin] works for her"—not because doctors believed that the Focalin was ineffective
when taken.  (*Id*.)  And although Plaintiff had "ups and downs" during this stay, including
exhibiting negative behaviors close in time to her discharge, it is also true that in this period,
Plaintiff "was not completely following the rules in the program[.]"  (*Id*.)  When Plaintiff
thereafter did follow those rules, she "did well for about a week" and was discharged in October
2018.  (*Id*. at 1246)  So again, taken together, this record could just as well support Defendant's
conclusion:  that when Plaintiff did not follow her treatment plan's "rules," including taking her
medication consistently, she suffered from emotional outbursts, off-task and aggressive behavior;
when she did follow the "rules," her outcomes were much better.

In the end, the Court must stress that as to an issue like this one, its review is limited to considering only whether the ALJ's decision was supported by "substantial evidence."  This evidentiary threshold is "not high"; there simply needs to be "more than a mere scintilla" of evidence to support the ALJ's conclusion.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotation marks and citations omitted).  And here, for the reasons set out above, there is well more than a scintilla of supporting evidence.  Instead, there is a great deal of support for the ALJ's conclusion that when she was compliant with medication, Plaintiff did not exhibit symptoms that met, exceeded or functionally equaled a listing.  (D.I. 19 at 16)  On this ground too, then, remand is not appropriate.

### 3.   Were the ALJ and Appeals Council Judges Properly Appointed, Such that they Had Legal Authority to Adjudicate this Case?

The Court turns to Plaintiff's final argument on appeal:  that, pursuant to the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3346(a), the ALJ and Appeals Council were not properly appointed by Nancy Berryhill ("Berryhill"), the former Acting Commissioner of Social Security, and so they could not lawfully have adjudicated her disability application.  (D.I. 15 at 12-13)  In making this claim, Plaintiff heavily relies on the arguments made in *Brian T.D. v. Kijakazi*, 580 F. Supp. 3d 615 (D. Minn. 2022).  So the Court will begin its discussion with that case.[14]

In *Brian*, the plaintiff took issue with whether, pursuant to the FVRA, Berryhill was properly serving as Acting Commissioner when the SSA ALJs were ratified.  *Brian*, 580 F. Supp. 3d at 627.  Section 3346(a) of the FVRA provides as follows:

---

[14]     As will become clear, the decision in *Brian* represents a minority, outlier view; in fact, *Brian* has since been reversed and remanded by the United States Court of Appeals for the Eighth Circuit.

> "[T]he person serving as an acting officer as described under section 3345 may serve in the office—
>
> (1) for no longer than 210 days beginning on the date the vacancy occurs; or
>
> (2) subject to subsection (b), once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate.

5 U.S.C. § 3346(a).  Additionally, Section 3346(a)(1)'s 210-day period may be extended to 300 days when the vacancy occurs (as it did here) at the beginning of a presidential transition.  *Id.* § 3349a(b).

Berryhill began serving as Acting Commissioner on January 20, 2017 after President Trump's inauguration; thus, her 300-day term ended on November 16, 2017.  *Id.* at 620-21.  Yet, Berryhill continued to serve in this role, and in March 2018, the U.S. Government Accountability Office ("GAO") reported that Berryhill's continued service as Acting Commissioner violated the time limitations on acting service imposed by the FVRA.  *Id.* at 621.  Because no nomination for the office had yet been submitted, Berryhill could not legally serve as Acting Commissioner after November 16, 2017.  *Id.* at 621 & n.2.  Berryhill ceased serving as Acting Commissioner shortly after the GAO issued its March 2018 report.  *Id.* at 621.

Thereafter, in April 2018, President Trump nominated Andrew Saul ("Saul") to be the Commissioner of Social Security.  *Id.*  After Saul's nomination was submitted to the United States Senate, Berryhill resumed her service as Acting Commissioner, pursuant to FVRA Section 3346(a)(2).  *Id.*  During this stint of active service, Berryhill approved the appointments of the ALJs at issue here.

Because Saul was nominated after Berryhill's initial term as Acting Commissioner had already expired, the plaintiff in *Brian* argued that Berryhill could not have later resumed Acting Commissioner status once President Trump nominated Saul for the position.  In support, the plaintiff claimed that a person may serve under Section 3346(a)(2) while a nomination is pending *only if* the nomination occurred while that person was in his or her initial 210-day period of service authorized by Section 3346(a)(1).  *Id.* at 627.  In other words, the plaintiff asserted that if an Acting Commissioner's term under Section 3346(a)(1) expired before a new Commissioner was nominated, then the Acting Commissioner may not thereafter serve pursuant to Section 3346(a)(2) at any point.  *Id.*  The plaintiff said that this was so because Section 3346(a)(2) is exclusively a tolling provision that extends the period authorized by Section 3346(a)(1) and cannot be utilized after that period has run.  *Id.* at 627-29.

The United States District Court for the District of Minnesota ("District of Minnesota") agreed.  The court concluded that Section 3346(a)(2) did not contain a "spring-back" provision that would have allowed Berryhill to resume her position as Acting Commissioner after her initial term had expired.  *Id.* at 629-32.  The District of Minnesota relied on numerous arguments in support of this conclusion, but the primary argument related to the language found in Section 3346(a)'s introductory sentence.  Specifically, Section 3346(a) applies to "the person *serving* as an acting officer" under Section 3345.  The District of Minnesota took this to mean that Congress intended for Section 3346(a) to apply to the person who was *presently serving* in that capacity, and not to a person who *had previously served* as Acting Commissioner.  *Id.* at 629.  Thus, the District of Minnesota concluded that Berryhill had not been properly acting as Acting Commissioner when she approved the SSA ALJs.

Despite this decision, the overwhelming majority of courts, including the United States Court of Appeals for the Eighth Circuit[15] and the United States Court of Appeals for the Fourth Circuit, have held that Section 3346(a) allowed Berryhill to resume her position as Acting Commissioner following the President's nomination of Saul.  Because the rationales of the two appellate courts were similar, the Court will make reference herein to the Eighth Circuit's decision by way of example.  In *Dahle v. Kijakazi*, 62 F.4th 424 (8th Cir. 2023), the Eighth Circuit reversed and remanded *Brian*, concluding that:

> Subsection 2 can act as a tolling provision to subsection 1.  But it also provides an independent period of time for an individual to serve as an acting officer.  The use of "or" as a connector between subsections 1 and 2 requires the subsections be given distinct, independent, meanings. . . .  Subsections 1 and 2 operate independently, providing distinct limitations on when an individual who is qualified to serve under [Section] 3345 may begin or end their service.  Subsection 1 allows an individual to serve for 210 days after a vacancy occurs.  Subsection 2 allows an individual to serve from the time a nomination is sent to the Senate until that nomination is no longer pending.  Subsection 2 contains no time limit expressed in a number of days and speaks in no manner as to other requirements for a person to serve as an acting officer.  Rather, it provides a time limit through reference to Senate action.  There is simply no textual basis to imply that subsection 1 and its 210-day limit somehow restrict a person's service under subsection 2.

62 F.4th at 427-28 (citations omitted).  The Eighth Circuit also rejected the *Brian* plaintiff's argument that the statute's use of "serving" requires that an individual be *presently serving* as Acting Commissioner under Section 3346(a)(1) in order to serve under Section 3346(a)(2).  The Court noted that "serving" appears in the text of Section 3346(a), meaning it should apply equally to Sections 3346(a)(1) and 3346(a)(2).  *Id*. at 428.  Thus, it reasoned that if an individual

---

[15]    The Eighth Circuit's decision was issued after the parties here had finished briefing on the instant motions.  (D.I. 25)

33

had to be "serving" to qualify to serve under Section 3346(a)(2), then the individual would also have to be "serving" to qualify to serve under Section 3346(a)(1). *Id.* However, this would ultimately "require an individual be properly serving as an acting officer before their 210-day period under [Section] 3346(a)(1) begins, [which is] an impossibility." *Id.* Thus, the Eighth Circuit concluded that the more appropriate way to read the phrase "the person serving" was "as a reference to the person qualified to be serving under [Section] 3345 [of the Act], not as a reference to [the] individual[] 'presently' serving under [Section] 3346(a)(1)." *Id.* The Eighth Circuit determined that in light of the above-referenced reasons and other compelling reasons, Berryhill was properly serving as Acting Commissioner when the appointments in question were made. *Id.* at 428-29 (noting additionally and persuasively, for example, why the legislative history of the Act also supports Defendant's position here).

In addition to the Eighth Circuit's decision in *Dahle* and the Fourth Circuit's decision in *Rush v. Kijakazi*, 65 F.4th 114 (4th Cir. 2023), numerous other federal courts have come out the same way on this question. All have found that Berryhill was properly serving as Acting Commissioner and thus, had properly appointed the Social Security ALJs and Appeals Council members in question. *See e.g.*, *Drake v. Kijakazi*, Civil No. 1:22-CV-980, 2023 WL 3060811, at *13-14 (M.D. Pa. Apr. 24, 2023); *Alicia M. v. Comm'r of Soc. Sec.*, Case No.: 2:21-cv-00433-REP, 2023 WL 2744135, at *10 (D. Idaho Mar. 31, 2023); *Wilson v. Comm'r of Soc. Sec.*, 3:22-cv-00087-RJC, 2023 WL 2728729, at *5 (W.D.N.C. Mar. 30, 2023); *Schneider v. Comm'r of Soc. Sec.*, No. 2:21-CV-1725-DAD-DMC, 2023 WL 2480861, at *8 (E.D. Ca. Mar. 13, 2023); *Parker v. Kijakazi*, Civil Action No. 9:22-1041-RMG, 2023 WL 2180069, at *2 (D.S.C. Feb. 23, 2023); *Tamara G. v. Comm'r of Soc. Sec. Admin.*, Civil Case No. 3:22-CV-631-D-BK, 2023 WL 2504912, at *4-5 (N.D. Tex. Feb 13, 2023).

Given the great weight of authority, and the sound reasoning contained in these decisions, the Court sees no basis to come to any different conclusion. Thus, it concludes that the ALJ and Appeals Council members were properly appointed at the time of the underlying decision. Accordingly, a remand for this reason is also not appropriate.

## IV.    CONCLUSION

Having read through much of the massive record in this case, the Court can see how difficult a road the last many years must have been for Plaintiff, her mother and their family. However, even recognizing that reality, the Court's role is limited here to addressing the particular issues raised by Plaintiff and her counsel on appeal, pursuant to the applicable standards of review (standards that, as to at least some of the issues discussed herein, are particularly favorable to the Commissioner). Having done so, for the reasons set forth in this Report and Recommendation, the Court cannot find that reversal and remand is appropriate. As such, it recommends that the District Court DENY Plaintiff's Motion and GRANT Defendant's Motion.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated March 7, 2022, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated:  July 26, 2023

Christopher J. Burke

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE